**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DEBORAH S. MEYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  CIV-02-1691-F |
| | ) | |
| THE TOWN OF BUFFALO, | ) | |
| OKLAHOMA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

This matter comes before the court on the motion of the defendant Board of County Commissioners of Harper County for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The matter has been fully briefed and upon due consideration of the parties' submissions, the court makes its determination.

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

## **Nature of the Case**

Viewed in the light most favorable to the plaintiff, the facts of this case are as follows. The plaintiff, Deborah S. Meyer, had been romantically involved with Mark Erwin an employee of the Town of Buffalo. The relationship ended less than amicably on or about May 10, 2001. During their relationship, Mr. Erwin told Ms. Meyer that he was a "ten man" in the Ku Klux Klan, which he told her meant that he was an "enforcer" in the organization. Erwin was frequently angry with Ms. Meyer. He also began expressing anger toward his sister, Beth Snell, and made threats against her.

On the night of Thursday, May 17, 2001, or the early hours of Friday, May 18, 2001, Ms. Meyer was physically assaulted outside her rural home when she stepped outside to investigate a noise. She stated that she was "sucker punched" in the face with great force and knocked to the ground. She alleges that her assailant was Mr. Erwin, but it is not clear when she first identified him as her attacker. She did not report the attack immediately.

In the early morning hours of May 19, 2001, Ms. Meyer telephoned the Harper County dispatcher to report trespassers on her property. When Sheriff's Deputy Josh Snider arrived, she also tried to report the attack from the previous night. Deputy Snider informed her that she would have to make her assault report in town.

On the evening of Saturday, May 19, 2001, Ms. Meyer drove into Buffalo, the county seat of Harper County, to make the report. On her way to the sheriff's office she spotted Mr. Erwin at a convenience store. She confronted him and told him to stay away from her. Ms. Meyer continued on to the sheriff's office where she attempted to make an assault report to the dispatcher who served both the county sheriff's office and the city police department. The dispatcher told her they didn't "do that" there.

Ms. Meyer then went to the home of the Buffalo police chief and informed him that the sheriff's office would not take her report. Even though Ms. Meyer's home where the attack occurred was some 18 miles out of town and so not in the jurisdiction of the Town of Buffalo, the police chief told her to go to the police station. He had an officer, defendant Steve Wheaton, meet her there. Officer Wheaton photographed Ms. Meyer's bruises and told her he would consult with the sheriff's office.

After leaving the police station, Ms. Meyer went to confront Mr. Erwin again. She drove to Wheatland Commodities, a Buffalo business owned by Mr. Erwin's sister, Beth Snell. Ms. Meyer knew that a family graduation party was being held there in honor of Mr. Erwin's niece. At Wheatland Commodities, Ms. Meyer confronted Mr. Erwin in the presence of his sister and her husband. She displayed her bruises and informed Mr. Erwin's family members that he had assaulted her. She then asked Mr. Erwin if he wanted to "finish what he'd started." She also announced that Mr. Erwin was an "enforcer" with the Ku Klux Klan and that he was planning to murder Beth Snell. Ms. Snell told Ms. Meyer that she was crazy and ordered her to leave. When Ms. Meyer refused, Ms. Snell warned that she would call for the authorities. At approximately 10:15 p.m., Ms. Snell called the sheriff's office to report that Ms. Meyer was "crazy" and refusing to leave her premises. Ms. Meyer says that she never became violent and never threatened violence during this verbal confrontation. Testifying in another proceeding, Beth Snell said that there had been no violence and no threats.

Officer Wheaton and Sheriff's Deputies Shawn Stoddard, Josh Snider, and Joe Painter arrived at the scene. Ms. Meyer was asked to wait in her vehicle and allowed Deputy Snider to escort her to her vehicle where she waited willingly and calmly while the other officers took statements from Mr. Erwin and the Snells. None of the officers attempted to take any sort of statement from Ms. Meyer or to ask her any

questions. It was decided that an emergency order of detention for psychiatric evaluation should be sought. The record is unclear as to how this decision was made and by whom. Deputies Stoddard, Snider, and Painter argue that they did not cause or contribute to the detention.

At some point, Deputy Stoddard left the scene and placed a call to Western State Psychiatric Center ("Western State"). He returned and informed Officer Wheaton that Western State staff advised that Ms. Meyer could be brought in for examination. Ms. Meyer maintains that from the time the officers arrived until they handcuffed her and took her away, a span of about one hour, she had been calm and cooperative. The unsworn "Peace Officer's Affidavit for Emergency Detention" by Officer Wheaton, which is included in the Western State records, makes no mention of any violence or threats by Ms. Meyer, or of any resistance. Officer Wheaton's written statement refers to "affidavits" of other witnesses (apparently referring to written statements given by Beth Snell, Mark Erwin, and Leon Snell, who also had been present at Wheatland Commodities) as additional sources of information to support the necessity of emergency detention, but those statements similarly make no mention of acts or threats of violence by Ms. Meyer.

Ms. Meyer was taken to Western State, where she arrived in the custody of Wheaton, Snider, and Painter just before midnight. There is considerable dispute regarding the affidavits and reports provided to Western State by the defendant officers. Ms. Meyer's medical file contains only Officer Wheaton's statement (which was styled an affidavit but not notarized), and other unsworn statements of the officers.

Despite evidence that Ms. Meyer had neither acted violently nor threatened violence and that she never resisted the defendant officers, Western State's admitting physician, Jennifer Morris, M.D., noted in her reports that Ms. Meyer had

"apparently" threatened violence and required four officers to restrain her. There is no such information in the written reports submitted by the defendant officers. A subsequent note from Dr. Morris states that she was unable to "find the entirety of the written police officer material" she reviewed in connection with Ms. Meyer's detention. Two persons on duty at Western state at the time of Ms. Meyer's admission were related to a law enforcement defendant. After examining Ms. Meyer, Dr. Morris concluded that she had "the desire to harm" Mr. Erwin and that she might do so if she were not detained until she could regain her impulse control. Ms. Meyer was admitted to Western State. She was released the following Monday, May 21, two days after her admission to Western State

Ms. Meyer filed this action against Officer Wheaton, Deputies Stoddard, Snider and Painter, the Town of Buffalo, and the Board of Commissioners of Harper County (the "Board"), pursuant to title 42, § 1983 of the U.S. Code, for violation of her rights under First, Fourth, and Fourteenth Amendments to the United States Constitution. She also brought an array of state law tort claims against those defendants as well as against Mark Erwin, Beth Snell and Crystal Stoddard, a hospital clerk. On March 3, 2004, this court entered its order granting summary judgment in favor of Steve Wheaton, the Town of Buffalo, Shawn Stoddard, Josh Snider, Tommy Painter, and the Board of County Commissioners of Harper County with respect to all of Ms. Meyer's constitutional claims. Because that order resolved all of the plaintiff's federal law claims, her state law claims against Steve Wheaton, the Town of Buffalo, Shawn Stoddard, Josh Snider, Tommy Painter, the Board of County Commissioner of Harper County, Mark Erwin, Beth Snell, and Crystal Stoddard were dismissed without prejudice pursuant to 28 U.S.C. § 1367 (c)(3). Ms. Meyer appealed and the Tenth Circuit Court of Appeals reversed the summary judgment in favor of Shawn Stoddard, Josh Snider, and Tommy Painter on Ms. Meyer's First Amendment and Fourth

Amendment claims. It also reversed the court's dismissal of Ms. Meyer's state law claims and remanded the matter for further proceedings. Accordingly, the court now turns to the Board's motion for summary judgment on Ms. Meyer's state law tort claims for false imprisonment, abuse of process, civil conspiracy, intentional infliction of emotional distress, and wrongful detention pursuant to mental health statutory provisions.

## Analysis

The Board contends Ms. Meyer's state law tort claims are untenable in light of Oklahoma law and the uncontroverted facts of the case. It points to Ms. Meyer's deposition testimony stating that the Board was not involved in the incidents occurring on May 19, 2001, including the plaintiff's transport and admission to Western State. It also points out that Ms. Meyer has testified that she is not making an allegation of civil conspiracy against the Board and that she is not alleging that the Board intentionally inflicted emotional distress upon her. It appears from her response to the Board's motion that Ms. Meyer is not pursuing a claim for intentional infliction of emotional distress against the Board. Furthermore, although she purports to state a claim against the Board for civil conspiracy, she has wholly failed to controvert the Board's proffered material fact that Ms. Meyer stated in her deposition that she is making no such claim against the Board. As to the remaining state law claims, the Board argues that it is exempt from liability pursuant to the Oklahoma Governmental Tort Claims Act, 51 O.S. 2001& Supp. 2006 § 151 *et seq.*

The Oklahoma Governmental Tort Claims Act (the "Tort Claims Act") provides the exclusive remedy by which an injured plaintiff may recover against a governmental subdivision in tort. *See* Fuller v. Odom, 741 P.2d 449, 451 (Okla. 1987). It extends governmental accountability to all torts for which a private person or entity would be liable subject to specific limitations and exceptions. Salazar v. City

of Oklahoma City, 1999 OK 20, 976 P.2d 1056, 1066.  Section 155, subsection 6 of the Tort Claims Act affords immunity to governmental subdivisions for claims that result from "the failure to provide, or the method of providing, police, law enforcement or fire protection." "'Protection' serves as the key word for the textual analysis of the critical sentence quoted here from subsection 6." Salazar at 1066.  The exemption set forth in subsection 6 may be invoked when the tort arises while the political subdivision is rendering services that fall within the category of protection. "In short, a governmental subdivision is not *liable for deficiency of protective services extended by its police, law enforcement or fire fighting components." Id.* (emphasis in the original).

Here, Ms. Meyer's claim against the Board for false imprisonment arises from the defendant Sheriff's deputies, Shawn Stoddard, Josh Snider, and Tommy Painter having detained Ms. Meyer and taken her into protective custody for transport and admission to Western State.  Her claim against the Board for abuse of process arises from the defendant sheriff's deputies having refused to take her assault report, and from their having allegedly made false reports" "to ensure that [she] would be detained on an emergency basis as a person who was mentally ill and in need of immediate treatment.  *See* First Amended Complaint at ¶¶ 65-66.  Her claim for wrongful detention and commitment pursuant to the Mental Health Statutes of the State of Oklahoma is directed not toward the Board at all but toward the Town of Buffalo and officer Steve Wheaton.  *See* First Amended Complaint at ¶¶ 74-76.  Ms. Meyer has dismissed her action against those defendants and the court will not address that claim.

Because Ms. Meyer's false imprisonment and abuse of process claims center upon the sheriff's deputies having detained Ms. Meyer and taken her into protective

custody and then assisted with her transport and her admission to Western State, the Board maintains it has immunity from those claims under § 155 (6) of the Tort Claims Act.[1] The Board argues that the facts of this case are analogous to those considered by the Oklahoma Supreme Court in Schmidt v. Grady County, Oklahoma, 943 P.2d 595 (Okla. 1997). In Schmidt, a woman who had been taken into custody by a deputy sheriff in order to protect her from harming herself or others, jumped or fell from the deputy's vehicle and brought suit for the resulting injuries. The Oklahoma Supreme Court addressed the following certified question:

> Does § 155 (6) of Title 51 of the Oklahoma Statutes immunize a political subdivision from liability from damages for personal injury an individual sustained as a result of a negligent act or omission of the political subdivision's law enforcement personnel while acting within the scope of their employment when taking the individual into protective custody and transporting her to the county jail?

The Court concluded that the deputy was acting as a police officer in relation to the plaintiff and was providing protection to both the plaintiff and the public. The Court therefore held that § 155 (6) "provides immunity for a political subdivision for liability for personal injuries resulting from the acts of its employees acting within the scope of their employment in taking into protective custody and transporting a person to the county jail." Schmidt at 598.

---

[1] In support of her abuse of process claim, Ms. Meyer also alleges the following "additional material facts:" 1) The Sheriff of Harper County approved the Report of Josh Snider; 2) the Report of Josh Snider is obviously back-dated; 3) Harper County never made a report of the assault on Deborah Meyer by Mark Erwin; and 4) the undersheriff was called at least three times concerning the call by Meyer that she had been "sucker-punched" before the undersheriff finally authorized Snider to go take a report from Meyer. All of these facts arise from Ms. Meyer's allegation that the Harper County Sheriff was unresponsive to her calls for protection. Such matters would appear to fall squarely within the immunity provided by § 155 (6).

The Board contends that Schmidt is dispositive of the plaintiff's false imprisonment and abuse of process claims. Ms. Meyer offers absolutely no meaningful response to the Board's argument. The court has examined other Oklahoma cases discussing § 155 (6) immunity for illumination as to whether the immunity should apply when the plaintiff claims her injuries are due to having been falsely imprisoned. In Salazar, *supra*, an arrestee filed a negligence action after being detained for three days before police officials determined he was not the individual named in the arrest warrant. The municipal defendant claimed immunity pursuant to § 155 (6). The Oklahoma Supreme Court held that Schmidt did not interpret the section to provide police with a blanket immunity. The immunity operates only when police are providing a *protective service*. Because the plaintiff was arrested on suspicion that he had molested an eleven-year-old girl, the arrest was considered a law enforcement function. The Court observed that such a situation must be distinguished from Schmidt, where the plaintiff was taken into *protective* custody.

Ms. Meyer has made no allegation that her detention was incident to any law enforcement function of the defendant sheriff's deputies. Her complaint, as well as her own statement of facts, recites that she was placed into protective custody by the defendants. *See* The Plaintiff's Combined Statement of Additional Facts for the Court to Consider, or to Controvert Material Facts, for Her Response to the Defendants' Motions for Summary Judgment at p. 12, ¶ 57. Oklahoma courts do not appear to have specifically addressed a situation where a plaintiff not only challenges the methods used in providing her protection, but also disputes whether the initiation of protective custody was itself proper. The holdings of Schmidt and Salazar, however, indicate that § 155 (6) provides the Board with immunity where the defendant sheriff's deputies were ostensibly acting to protect the plaintiff and the public. The

Board's motion for summary judgment with regard to Ms. Meyer's false imprisonment and abuse of process claims should, therefore, be granted.

In her response to the Board's motion for summary judgment, Ms. Meyer states that if the Board is found to have immunity pursuant to the Tort Claims Act and its subdivisions, "then, in that event, the Plaintiff has a civil rights claim pursuant to Section 1983 against the County for violation of her right to due process of law, i.e., failure to provide a post-deprivation remedy for violation of her liberty." The court of appeals previously upheld this court's ruling in favor of the Board on Ms. Meyer's constitutional claims. To assert a claim not set forth in the First Amended Complaint would, of course, require the complaint to be amended further – a dubious proposition at this stage of the case.

## **Conclusion**

For all of the foregoing reasons, the motion for summary judgment filed January 5, 2004 by the Board of County Commissioners for Harper County (docket entry no. 92) should be and hereby is GRANTED with respect to the plaintiff's state law claims.

Dated this 22nd day of August, 2007.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

02-1691p029(pub).wpd